UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID BANKS,

        Plaintiff,

v.

TOWN OF PLAINVILLE and JAMES
FLOYD, Individually and in his
Official Capacity,

        Defendants.

No. 18-cv-12084-DLC

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DONALD L. CABELL, U.S.M.J.

    Plaintiff David Banks contends that the Town of Plainville, MA (the Town) and Plainville Police Detective James Floyd (Detective Floyd) violated his rights in the course of investigating an incident outside his home.  The defendants move for summary judgment.  (D. 31).  For the reasons explained below, the motion is ALLOWED in part and DENIED in part.

## I.   FACTS

    The following facts are undisputed unless otherwise noted and are presented in a light most favorable to the plaintiff as the non-moving party.

## A. **The July 30, 2016 Altercation**

This case has its origins in an incident that occurred at approximately 2:00 AM on July 30, 2016, outside of the plaintiff's Plainville residence.  The plaintiff was inside sleeping when he awoke to the sound of his dogs barking.  (D. 38, Plaintiff David Banks's Response to Defendant's Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("Pl.'s SOF"), ¶ 117).   The plaintiff got out of bed and looked outside and saw two cars parked outside of his house, with two individuals standing beside the cars on the side closest to the house.  (Id., ¶ 120).  The plaintiff went outside and heard the two individuals (later identified as Plainville police officer Julie Barrett and Detective James Moses) kissing.  (Id., ¶¶ 122, 125, 126).  A truck pulled up about 20 minutes later and the driver, later identified as former North Attleboro Police Sergeant David Gould, verbally confronted the pair and hit Detective Moses.  (Id., ¶¶ 127-129).  The plaintiff's son Michael returned home from work shortly thereafter and saw the three vehicles starting to leave.  (Id., ¶ 130).  The plaintiff did not call the police because "it didn't involve [him]" and because he did not have license plate information to report.  (Id., ¶ 20).

About a week and a half after the incident, Plainville police officer William Lamb told defendant Detective Floyd that a physical altercation had occurred on Old Taunton Street, the street where

the plaintiff resided, and that Officer Barret and Detective Moses had sustained injuries by Gould. (Id., ¶ 137).  On August 17, 2016, Detective Floyd interviewed Detective Moses.  Moses confirmed that Gould had punched him during the July 30th incident but he (Moses) did not want to pursue charges. (Id., ¶¶ 145, 146).

**B. The Plaintiff's Visit to Town Hall**

The plaintiff learned that the individuals involved in the incident were police officers only after reading it in a newspaper article, about a month and a half after the incident. (Id., ¶ 21).  On September 27, 2016, he went to the Plainville Town Hall to pay his excise tax, and because he wanted to tell the Town Administrator that he knew "at least one cop was lying to the media" about the incident.[1]  (Id., ¶¶ 149, 150).  The Town Administrator was unavailable, so the plaintiff spoke instead with another town employee, Drusilla Proctor (Proctor).[2]  (Id., ¶ 151).

The plaintiff told Proctor that "he had witnessed the love-triangle" and that he had a game camera, although he did not know if there was anything on it. (Id., ¶ 38).  According to the defendants, the plaintiff also reportedly told Proctor that he had "cameras", but the plaintiff denies ever telling her that he had

---

[1] Apparently, a local newspaper accounting of the incident reported that Gould followed Moses and Barrett to the area outside the plaintiff's residence and pulled Moses out of the car. (Pl.'s SOF, ¶ 22).  This reporting was inconsistent with the plaintiff's recollection that Moses and Barrett were already out of their cars kissing when Gould showed up, 20-30 minutes later. (Id., ¶ 23).

[2] Proctor passed away on February 18, 2019. (D. 38 at 9 n. 1).

more than one camera.   (Defendants Town of Plainville and James Floyd's Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Defs.' SOF"), ¶¶ 38, 39; Pl.'s SOF, ¶¶ 39, 153).

Proctor relayed the plaintiff's statements to Plainville Police Chief James Alfred the same day and told him "David Banks...may have information, photos and video regarding an assault and battery that occurred the morning of July 30, 2016." (Id., ¶¶ 155-156).[3]

### C. **Detective Floyd's Investigation**

After speaking with Chief Alfred, Detective Floyd called the plaintiff the same day to investigate.   (Pl.'s SOF, ¶ 158).   The plaintiff told Detective Floyd that that he had a surveillance camera system that he used to deter insurance adjusters but was not interested in getting involved or providing specific details of the July 30th incident.   (Defs.' SOF, ¶¶ 50-52, 159).   Detective Floyd went to the plaintiff's home that same afternoon but neither the plaintiff nor his son would speak with him.   (Pl.'s SOF, ¶ 161).

Detective Floyd went to the plaintiff's home a few days later and observed a camera in the plaintiff's front window, pointing in the direction of the driveway in front of the house where the July

---

[3] Detective Floyd maintains that Chief Alfred told him that Proctor reported that the plaintiff stated more affirmatively that he "did" have video and photos of the incident.   (Defs.' SOF, ¶ 46).

30th incident occurred. (Defs.' SOF, ¶¶ 54-55). The plaintiff admits to telling Detective Floyd that "he had a surveillance system" but asserts that his game camera pointing at the driveway captured only about a foot's worth of the street in its frame. (Pl.'s SOF, ¶¶ 50, 176).

According to Detective Floyd, Proctor contacted him on October 3, 2016 and told him that the plaintiff had told her that he had photos and videos of the July 30th, 2016 incident, and again reiterated that he had cameras to deter private investigators looking into his personal life. (Defs.' SOF, ¶¶ 56-57). The plaintiff disputes that he ever said these things to Proctor. (Pl.'s SOF, ¶¶ 56-57).

**D. The Search Warrant Affidavit**

On October 5, 2016, Detective Floyd submitted an affidavit in support of a warrant to search the plaintiff's residence for electronically stored surveillance video of the July 30th incident. Detective Floyd averred among other things that: (1) the plaintiff told Proctor on September 27, 2016 that he "may have information, photos and video" regarding the incident; that (2) the plaintiff on or about the same day told Detective Floyd over the telephone that he did not want to "get involved or provide a copy of photos or video that he had captured with his home surveillance system"; that (3) Detective Floyd went to the plaintiff's residence that same day to speak with him and saw "an infrared camera in the front

5

window capturing the driveway area"; that (4) Proctor subsequently told Detective Floyd on October 3, 2016 that the plaintiff had told her he had "saved" photos and video of the incident by virtue of CCTV cameras installed at the residence; and that (5) the plaintiff said he had "electronically saved still photos he captured along with video from his CCTV home security system" and "admitted to utilizing a storage device to save photos and video of the incident". (D. 33-8). A Dedham District Court official subsequently granted the request. (Defs.' SOF, ¶¶ 58-59).

### E. Executing the Search Warrant

Detective Floyd and other members of the Plainville Police Department executed the search warrant on the evening of October 5, 2016. (Id., ¶¶ 184, 185). Among other things, they seized two cameras in the windows as well as storage devices in the home. (Defs.' SOF, ¶ 75). The plaintiff maintains that while Detective Floyd stated that "some" cameras were "hooked up", the cameras were never hooked up to a computer and those in the windows were never operational. (Pl.'s SOF, ¶¶ 189-191). The officers also seized a hard drive, HP computer tower, and an I-pad. (Id., ¶ 198).

In addition to electronics, the officers also found and removed from the home two rifles, four shotguns and a handgun. (Id. ¶ 193). The rifles and shotguns were determined to belong to another occupant of the residence, but the handgun was found in a

closed dresser drawer in the plaintiff's bedroom. (Id. ¶¶ 194, 195). According to the plaintiff, the handgun was in his ex-wife's bureau, was missing its clip, and was an inoperable antique. The plaintiff was never charged in connection with the handgun. (Id., ¶¶ 79, 109, 196).

No evidence relating to the July 30th altercation was found during the search. (Defs.' SOF, ¶ 83; Pl.'s SOF, ¶ 197).

### F. Aftermath of the Search

Detective Floyd noted that the plaintiff had an "old" open restraining order and three prior OUI convictions. (Pl.'s SOF, ¶¶ 202-203). Based on this information, Detective Floyd believed that the plaintiff was prohibited from obtaining a license to carry a firearm, under both state law (M.G.L. c. 140, § 131(d)(i)) and federal law (18 U.S.C. § 922(g)(1)). (Id., ¶ 204). Detective Floyd spoke with the plaintiff by telephone following the search and asked him to come to the police station.

The plaintiff claims that Detective Floyd brought up the gun during the phone conversation, and Detective Floyd admits to having told the plaintiff something to the effect that "if there was a crime committed using that firearm, Banks would be liable or potentially charged". (33-1, Banks Depo., at 108; 38-4, Floyd Depo., at 109).

The plaintiff claims that he did not want to be interviewed and only agreed because [Floyd] has this hanging over my head, you

own that and all of this...I'm not licensed for a gun and I was nervous about that."  (33-1, Banks Depo., at 107.)

During an interview on October 6, 2016, Detective Floyd asked the plaintiff both about the July 30th incident and the gun.  When asking about the gun, Detective Floyd stated, "when we run the serial numbers through ATF...you own whatever it is."  (D.33-3, Banks Interview Transcript, at 28-29).  The plaintiff alleges that he felt intimidated because he did not trust the Plainville police and that he "figured with all that they were trying to pull and everything, that [Floyd is] going to try and get me locked up for [the gun]." (33-1, Banks Depo., at 113.).  The plaintiff felt Detective Floyd was trying to "coerce him into testifying about the love triangle incident" and he "wasn't going to do it." (Id.).

Detective Floyd also questioned the plaintiff about the July 30th incident, and the plaintiff expounded on his prior statements to police and others as to whether he in fact possessed any audio/video evidence of the July 30th altercation.  He said, among other things, "Well, I split hairs before.  I never said that I had videos or anything; I said that I had cameras." (Pl.'s SOF, ¶¶ 208-210; Defs.' SOF, ¶¶ 91, 93).  He added, "Well, I got the cameras.  And I'm saying to myself, [t]hey don't know what's on them.  Let them think there's something on them, see how they feel. You know what I mean?  Let me frustrate them and see how they feel.

Was it right?  Looking back, no, it wasn't.  Did it make me feel better?  Yeah, it did..."  (Defs.' SOF, ¶ 92).

The plaintiff alleges that after the interview, the pending gun charge was purposefully left as "under investigation" for the purpose of being used as leverage to compel him to testify at the trials of Gould and Moses and the Civil Service Appeal of Gould. (Pl.'s SOF, ¶ 221).  The plaintiff states, and the defendants have not refuted, that the plaintiff was summonsed to appear at the hearings.  (D. 1-1 ¶ 59).

## II.  <u>LEGAL STANDARD</u>

When the court is presented with a motion for summary judgment, it shall grant it "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality."  *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003).  Once the moving party meets that burden, in order to avoid summary judgment, the opposing party must "show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation."  *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (quoting *Ingram v.*

*Brink's, Inc.*, 414 F.3d 222, 228–29 (1st Cir. 2005)).  Indeed, the opposing party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (quoting *Triangle Trading Co. v. Robroy Indus. Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* (citing *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)) (internal quotation marks omitted).

## III. **DISCUSSION**

The complaint asserts three claims.  Count I alleges a violation of 42 U.S.C 1983 against both defendants for conducting an unlawful search and seizure in violation of the plaintiff's Fourth Amendment rights.  Counts II and III allege claims against Detective Floyd for violation of the Massachusetts Civil Rights Act (MCRA) and for intentional infliction of emotional distress, respectively.

## A. **Count I — Violation of 42 U.S.C. § 1983**

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Count I alleges that the defendants violated the plaintiff's Fourth Amendment right to be free from an unreasonable search and seizure because Detective Floyd, knowing he lacked probable cause to obtain a warrant, "knowingly made false and distorted allegations of material facts" in his affidavit in order to obtain one.[4]

Focusing first on Detective Floyd, he argues that summary judgment is appropriate because he enjoys qualified immunity for his conduct. Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v.*

---

[4] Although Count I from its heading alleges just a "VIOLATION OF 42 U.S.C. § 1983", the complaint asserts in the text that follows that the defendants also violated the "Massachusetts Declaration of Rights". This reference to the state constitution appears to be inadvertent surplusage where the parties have consistently treated Count I as alleging only a violation of § 1983. Similarly, the complaint asserts that the defendants "exceeded the scope of authority permitted by the warrant". This language also appears to be misplaced surplusage where the plaintiff does not argue anywhere that officers exceeded the scope of the warrant assuming it was properly issued. This argument would fail in any event where the warrant, assuming it was properly issued, entitled the officers to search anywhere in the residence where computers, tablets and other electronically stored devices could reasonably be found. *See, e.g., U.S. v. Peake*, 804 F.3d 81, 87 (1st Cir. 2015).

*al-Kidd*, 563 U.S. 731 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Courts have discretion to decide which qualified immunity prong to address first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation..."  U.S. Const. amend. IV.  The Fourth Amendment's probable cause requirement is violated when a false statement is knowingly and intentionally, or with a reckless disregard for the truth, included by the affiant in a warrant affidavit, provided the false statement is material, that is, necessary for a finding of probable cause.  *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).  A statement is not material if, after eliminating it, the corrected affidavit would still have supported a finding of probable cause.  *Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st Cir. 2005).

As there can be no dispute that the right to be free from a search warrant obtained through fabricated evidence was well established at the time of the incident, *see e.g., Aponte Matos v. Toledo-Davila*, 135 F.3d 182 (1st Cir. 1998), the court need only consider whether or not the record supports a finding that

Detective Floyd violated the plaintiff's constitutional rights in seeking a warrant to search his residence.

Broadly speaking, the plaintiff argues that Detective Floyd's affidavit was deficient in two principal ways.  First, he included information of questionable veracity obtained from Proctor during an October 3rd interview, namely that the plaintiff had admitted to having and saving photos and videos of the incident.[5]  The plaintiff argues that Detective Floyd had a basis to doubt the veracity of this information because it was more fulsome than the information Proctor had provided him previously, calling at a minimum for corroboration before using it.  Second, Detective Floyd included knowingly false and/or misleading statements to bolster his application.  As an example, Detective Floyd reportedly "aggrandized" his phone conversation with the plaintiff by falsely stating that the plaintiff had admitted to having photos and videos, which the plaintiff denies, and included contradictory assertions as to whether a camera visible in the plaintiff's front window was "infrared" or sufficiently positioned to capture the events in question.

---

[5] According to the affidavit, Proctor initially contacted a Town official on September 27, 2016 to report that the plaintiff told her he might have photos and videos of the incident, but then reportedly told Detective Floyd during their October 3rd interview that plaintiff affirmatively said he had saved "photos and videos" of the incident by virtue of a "CCTV home security system" he had installed to deter insurance investigators.  Compare D.33-8, Search Warrant Aff., ¶ 13 with ¶¶ 15-16.

The plaintiff's allegations of improper police conduct are concerning if true. That being said, it is not necessary to resolve his claims for purposes of Count I because, even assuming the challenged statements in the affidavit were deemed false, and thus removed from consideration, the remaining information in the affidavit was sufficient to establish probable cause to believe that evidence of the July 30th incident would be found inside the plaintiff's residence.

In particular, there is no dispute that the plaintiff affirmatively told Proctor, someone he knew to be a Town employee and wanted to convey his information, that he witnessed the July 30th incident, that he had a camera at the property, and that he "may have photos and video" of the incident. There is also no dispute that Proctor conveyed that information to the police department. There is further no dispute that the plaintiff (at a minimum) told Detective Floyd the same day that he had witnessed the events and had a surveillance system at the property, and that Detective Floyd went to the plaintiff's residence and saw a camera in a window. Finally, the plaintiff acknowledges that, even assuming he did not make the statements Detective Floyd attributed to him, he nonetheless allowed officers to infer that one or more

cameras on his property may have filmed or photographed the incident.[6]

Against this backdrop, the court finds that there was probable cause for the search warrant to issue even absent the challenged statements. Put most simply, the plaintiff admitted that he observed the incident, indicated to multiple persons that he had one or more cameras on the property, suggested implicitly that the camera(s) may have captured the incident, and in fact had a camera in his front window looking outward. These facts were sufficient to provide probable cause to support a warrant to search the residence for electronic or photographic evidence. Accordingly, the issuance and execution of the search warrant did not violate the plaintiff's Fourth Amendment rights. *See e.g., U.S. v. Ruffin*, 664 Fed. App'x. 224, 227 (3d Cir. 2016) (unpublished) (affirming reasonableness of search warrant where officer observed surveillance system mounted to defendant's home but "did not know whether the [defendant's] cameras were operational or fake, were

---

[6] The plaintiff, when deposed, admitted to purposefully engaging in a campaign of "hair splitting" in an attempt to make the police and others believe that he had more than one camera on his property. D. 33-3 at 17. ("Well, I split hairs before. I never said that I had videos or anything; I said that I had cameras. And I told the chief, I says, you don't have to worry about anybody seeing any films. I didn't tell him because they don't exist, but again, I shouldn't have split the hair, but I did"). The plaintiff also allowed police to believe that his camera or cameras did indeed have footage. D. 33-3 at 24. ("Well, I got the cameras. And I'm saying to myself, they don't know what's on them. Let them think there's something on them, see how they feel. You know what I mean? Let me frustrate them and see how they feel. Was it right? Looking back, no, it wasn't. Did it make me feel better? Yeah, it did, you know?").

connected to an analog or digital system, recorded or streamed a live feed, or had been tampered with since the date of the [alleged crime]." Detective Floyd is therefore entitled to summary judgment on Count I.

Turning to the Town, no protracted discussion is necessary; it too is entitled to summary judgment on Count I where Detective Floyd did not violate the plaintiff's civil rights in obtaining the search warrant.[7] *See Evans v. Avery*, 100 F.3d 1033, 1040 (1st Cir. 1996) (municipality cannot be held liable absent a constitutional violation by its officers).

## B. Count II — Massachusetts Civil Rights Act (MCRA)

Count II alleges that Detective Floyd interfered with the plaintiff's enjoyment of his federal and state civil rights in violation of the Massachusetts Civil Rights Act (MCRA), M.G.L. c.12, §11(1). Count II is predicated on both the application for and execution of the warrant, as well as the events that transpired after the search.

To state a claim under the MCRA, a plaintiff must show that (1) his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of

---

[7]  The Town would be entitled to summary judgment on this record even assuming Detective Floyd acted improperly as alleged.  In order for a municipality to be held liable under 42 U.S.C. §1983, a plaintiff must show that the municipality had a policy or custom that resulted in the alleged constitutional violation.  *Santiago v. Fenton*, 891 F.2d 373, 381 (1st. Cir. 1989).  The complaint here does not allege the existence of such a policy or custom and the plaintiff has failed in any event to adduce evidence of one.

Massachusetts (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion. *Barbosa v. Conlon*, 962 F. Supp. 2d 316, 331–32 (D. Mass. 2013) (internal quotations and citations omitted).  The MCRA is coextensive with 42 U.S.C. § 1983 except that the MCRA does not require any state action and does require a violation by threats, intimidation or violence. *Kelly v. LaForce*, 288 F.3d 1, 10 (1st. Cir. 2002).

Without repeating its discussion regarding Count I, the court finds for the same reasons that Detective Floyd is entitled to summary judgment on the MCRA claim to the extent the claim alleges he disingenuously sought and obtained a search warrant in violation of the plaintiff's rights.

However, the plaintiff has presented sufficient evidence to survive summary judgment on his claim that Detective Floyd, following the search, used the recovered firearm to threaten or intimidate him into assisting the police with the ongoing investigation of the July 30th incident.  More specifically, the plaintiff has adduced evidence that he remained steadfastly opposed to assisting the police with their investigation and that Detective Floyd, aware of his reluctance, suggested the plaintiff could be prosecuted for possession of the firearm found during the search or for any crime with which the gun might be found to be linked.

In the court's view, the facts supporting the MCRA claim are not exceptionally compelling but the claim survives summary judgment because a factfinder crediting all of the facts in the plaintiff's favor could reasonably conclude from the sequence and timing of events that Detective Floyd knew the plaintiff did not want to cooperate in the July 30th investigation and held the prospect of further criminal investigation or prosecution regarding the firearm over the plaintiff's head in order to obtain his cooperation. *See Sanchez v. City of Boston*, 2011 WL 5508929, No. 10-11075-RGS, *2, n. 1 (D. Mass. November 10, 2011) (observing that use of threats of arrest and criminal charges to procure cooperation arguably makes out a claim under the MCRA).

The defendants argue that there is no evidence that Detective Floyd had the specific intent to interfere with the plaintiff's civil rights. Even assuming that is true, however, the MCRA may be violated "regardless of whether the defendant specifically intended to interfere with a right to which the plaintiff is entitled." *Redgrave v. Boston Symphony Orchestra, Inc.,* 399 Mass. 93, 100 (1987); *see also Reproductive Rights Network v. President of Univ. Mass.,* 699 N.E.2d 829, 838 (Mass. App. Ct. 1998) ("[W]e are unwilling to assume that the Legislature intended to require proof that an actor specifically intended to deprive a person of a secured right by threats, intimidation, or coercion."). It is enough if "the natural effect of the defendant's action was to

18

coerce [the plaintiffs] in the exercise of [their] rights."
*Redgrave*, 399 Mass. at 99.  As the record supports such a claim
here, the motion for summary judgment is denied with respect to
Count II.

### C. Count III — Intentional Infliction of Emotional Distress

Count III alleges that Detective Floyd "intentionally and/or
recklessly" inflicted emotional distress on Banks.  A claim of
intentional infliction of emotional distress (IIED) requires the
plaintiff to show (1) that the defendant intended, knew, or should
have known that his conduct would cause emotional distress; (2)
that the conduct was extreme and outrageous; (3) that the conduct
caused emotional distress; and (4) that the emotional distress was
severe.  *Bettencourt v. Town of Mendon*, 334 F. Supp. 3d 468, 487
(D. Mass. 2018).

As with Count II, the court finds for essentially the same
reasons that, while the facts supporting an IIED claim may not be
overwhelming, the plaintiff has adduced enough evidence, even if
just enough, to survive summary judgment.  Among other things, a
factfinder crediting all of the evidence, including the
plaintiff's as yet untested contention that Detective Floyd never
intended to charge the plaintiff with any offenses connected to
the firearm, never had a genuine basis to charge him with any
offense(s), and in fact did not charge him with any such offenses,
could reasonably conclude that Detective Floyd improperly used his

position to threaten a baseless prosecution to exploit the plaintiff's vulnerable position and obtain his cooperation. Such facts, if true, could in the court's view support a finding of extreme and outrageous conduct likely to cause emotional distress. Summary judgment is therefore denied on Count III.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (D. 31) is <u>ALLOWED</u> in part and <u>DENIED</u> in part. Specifically, the motion is ALLOWED with respect to Count I in favor of defendant James Floyd and the Town of Plainville. The complaint is accordingly dismissed against the Town of Plainville where it is named only in Count I. The motion is DENIED with respect to Counts II and III.

Because the court has granted summary judgment for the defendants on the plaintiff's sole federal claim, the remaining state law claims would be remanded to state court in the normal course. *Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017). However, where the parties here have already engaged in significant briefing on the issues of this case, the court will retain jurisdiction over the remaining state law claims. *See, e.g., McGinn v. Exec. Office of Energy & Envtl. Affairs*, No. 19-CV-11551-IT, 2020 WL 6263648, at *1 (D. Mass. Oct. 23, 2020) ("[w]here the parties have briefed and argued at hearing Defendants' motions to dismiss the remaining state law claims,

concerns about comity do not outweigh the pragmatic benefits of adjudicating, in full, the motions that are presently before this court.").


                                        /s/ Donald L. Cabell
                                        DONALD L. CABELL, U.S.M.J.


DATED: December 11, 2020